770 A.2d 1158

LAMORTE BURNS & CO., INC., A DELAWARE CORPORATION, PLAINTIFF–APPELLANT, v. MICHAEL A. WALTERS, NANCY NIXON AND THE WALTERS NIXON GROUP, INC., A NEW JERSEY CORPORATION, DEFENDANTS–RESPONDENTS.

Argued March 12, 2001—Decided May 14, 2001.

*Stephen H. Roth,* argued the cause for appellant (*Mr. Roth,* attorney; *Mr. Roth* and *Michele M. DeSantis,* on the briefs).

*Bruce D. Greenberg* argued the cause for respondents (*Lite DePalma Greenberg & Rivas,* attorneys).

The opinion of the Court was delivered by

LaVECCHIA, J.

In this case, we consider whether an employee has incurred liability for activities undertaken to plan and prepare for future employment in a newly created business entity established by the employee to compete directly with his current employer. Plaintiff, Lamorte Burns & Co. (Lamorte), filed suit against two of its former employees, Michael Walters and Nancy Nixon, in connection with their conduct in establishing a competing business. Plaintiff's complaint charged that Walters breached the restrictive covenant clauses of his employment agreement, and that both Walters and Nixon breached their duty of loyalty, tortiously interfered with Lamorte's economic advantage, misappropriated its confidential and proprietary information, and competed unfairly.

The trial court granted plaintiff's motion for summary judgment as to liability only. After a hearing, the trial court awarded $232,684 in compensatory damages and an additional $62,816.23 in punitive damages covering counsel fees and costs. In an unpublished opinion, the Appellate Division agreed that Walters had breached his employment contract, but reversed that part of the decision that granted plaintiff summary judgment on its tort claims. The court reasoned that there were disputed facts concerning the confidential and proprietary nature of the information defendants had taken from plaintiff, as well as issues concerning whether defendants' conduct was acceptable competitive behavior or malicious and in violation of the "rules of the game" of the parties' business. We granted certification, 165 *N.J.* 605, 762 *A.*2d 219 (2000), and now reverse, in part, and reinstate the trial court's judgment sustaining plaintiff's tort claims.

I.

A.

We regard the facts as not significantly in dispute. Where they are, we accord all inferences in favor of defendant as this matter is

before us on an appeal from a motion for summary judgment. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995). Lamorte has been in the business of investigating and adjusting claims for both marine and nonmarine liability insurers, their associations, and owners, in the United States and abroad since 1938. Incorporated in Delaware, Lamorte has its principal place of business in Wilton, Connecticut, and maintains a New Jersey office in Clark. The Clark office opened in 1986 chiefly to handle two types of marine insurance claims: protection and indemnity claims (P & I claims) consisting essentially of personal injury claims and federal longshore and harbor workers' compensation claims.

Walters met Nixon in the Clark office, where they both worked on P & I claims. When Walters arrived at Lamorte in 1990, Nixon had already established herself at the company. Walters, on the other hand, was recruited from out of state by Lamorte's President, Harold J. Halpin, to manage the Clark office, handle P & I claims, and supervise other employees, including Nixon. Walters, an attorney, had experience in the field. He previously had been employed in the P & I division of St. Paul Fire & Marine Insurance Company in Ohio, and before that, in the admiralty department of a Florida law firm.

Lamorte entrusted Walters with substantial responsibility. Lamorte introduced Walters to many of its existing clients, but expected him to locate, establish, and maintain new clients. Because of his prior work, Walters knew many insurance carriers and P & I associations that offered P & I coverage. As it turned out, Walters proved successful at soliciting and establishing new business; he claims to have brought in thirty new clients to Lamorte.

Approximately one month after Walters's arrival at Lamorte, Halpin asked him to sign an employment agreement. The relevant paragraphs of that agreement stated as follows:

2. You agree to devote your full time and best efforts to the performance of your duties for the Company and not to engage in any other business activities without the prior written consent of the Company.

4. *You agree to maintain in confidence all proprietary data and other confidential information (whether concerning the Company, or any of its affiliated companies, or any of their respective clients or cases being handled for clients) obtained or developed by you in the course of your employment with the Company. Such information and data shall include, but not be limited to, all information covering clients and cases being handled for clients. All such information and data is and shall remain the exclusive property of the Company and/or affiliated companies.* In addition you assign to the Company all right, title, and interest in and to any and all ideas, inventions, discoveries, trademarks, trade names, copyrights, patents and all other information and data of any kind developed by you during the entire period of your employment with the Company and related to the work performed by you for the Company.

You covenant and agree that upon termination of this Agreement for whatever reason, you will immediately return to the Company any and all files, documents, records, books, agreements or other written material belonging to or relating to the Company or its affiliated companies and any of their respective clients, together with all copies thereof in your possession or control. . . .

Your obligation under this paragraph shall survive any termination of your employment.

5. *Employee agrees that so long as you are an employee of the Company, and for a period of twelve (12) month after your termination, whether voluntary or involuntary, you will not solicit or accept any claim, case or dispute which is being handled or directed by the Company or any of its affiliated companies during the term of your employment with the Company.* You agree that you will not solicit or accept any such claim, case or dispute directly in your individual capacity, nor indirectly as a partner of a partnership, and as an employee of any other entity nor as an officer, director, or stockholder of a corporation, a joint venturer, a principal or in any other capacity.

You further agree not to solicit or induce any employee of the Company or any of its affiliated companies to leave its employ, nor to hire or attempt to hire any such employee. . . .

Walters signed the contract, but he never believed it was enforceable against him. He reasoned that because he was an at-will employee, the employment contract lacked consideration for its restrictive covenant clauses. Also, the agreement was never signed by Lamorte. A Florida attorney privately corroborated his view. Walters never expressed his beliefs to anyone at Lamorte, however, out of fear that he would be fired.

In the Spring of 1996, Walters quietly began entertaining the idea of resigning and starting a competing business. By that

time, Halpin had informed defendants that Lamorte would be de-emphasizing P & I work and increasing the workers' compensation area of the practice. For Walters, that constituted the impetus for his decision to start a competing business. Also about that time, two other employees departed the P & I department because there was not enough work to support the staff.

Walters spoke only with co-employees Nixon and John Treubig about his idea of starting a competing business. Walters showed Nixon some financial estimates he had developed, suggesting that she would improve her position if she were to join in his enterprise. Eventually, Walters lost interest in Treubig. Soon after, Halpin directed Walters to fire Treubig based on allegations that Treubig had tried to solicit a Lamorte client for his private benefit.

On July 17, 1996, Walters incorporated the new business, "The Walters Nixon Group" (WNG). Thereafter, even while Walters and Nixon attended to their duties at Lamorte, they secretly worked on the commencement of their new business venture. Each time they worked on a Lamorte P & I claim file, they added to a target solicitation list they were compiling using information from their employer's client files. That information included client names, addresses, phone and fax numbers, file numbers, claim incident dates, claim contact information, and names of the injured persons. In total, the list included approximately thirty of Lamorte's clients, all but one or two of the company's P & I clients. As that information was gathered, it was transferred to Walters's home computer.

Walters testified that he did not believe the names of Lamorte's clients and information concerning pending claims was Lamorte's proprietary and confidential information. He reasoned that the information, although not generally available to the public, was not secret. He asserted that the discrete information could be obtained by calling directly and inquiring of insurance companies and vessel owners. Further, other than the reference to "confidential and proprietary information" in his employment agreement

that Walters believed was unenforceable, he never had been told by Lamorte that any of the specific information he was gathering in connection with his P & I work was confidential and proprietary. Halpin, himself, never discussed the confidentiality of the information. During Walters's deposition, however, he answered "No" to the following question:

> Would you have given that information to a competitor if he walked in the door and said, I want to go after your customers [?] Give me a complete listing of their files, reference numbers, adjusters and fax numbers and I will use that to solicit them. You would have given that information to them?

In September 1996, Halpin confronted defendants concerning rumors that they were thinking of leaving to start a competing business. They reassured Halpin the rumors were untrue. Walters testified that he feared he would be fired if Halpin knew the truth. The truth was that Walters and Nixon were well on their way to establishing a competing business. By October 1997, they signed a three-year lease to commence December 1, 1997 for office space in Cranford, New Jersey. As December approached, they purchased office equipment, leased computers, and obtained telephone and fax lines for the new WNG office. They agreed that they would resign on the weekend of December 20–21, 1997, a date selected so that each would be eligible to collect Christmas bonuses from Lamorte. They planned that over the same weekend they would send to Lamorte's clients solicitation letters and forms directing the transfer of claim files.

Just prior to resigning, Walters was asked by Halpin to sign a new and more restrictive employment agreement. The proposed agreement included a clause prohibiting him from working for any of plaintiff's customers for a full year, no longer just prohibiting him from working on claim files with which he was actively involved at Lamorte. Nixon also was asked to sign a corresponding employment agreement. Defendants avoided signing those agreements before their resignations.

On Thursday and Friday, December 18 and 19, 1997, Walters called in sick. In fact, Walters was at WNG's office installing computers, setting up furniture, and preparing to activate the

business solicitation plan over the coming weekend. Telephone records showed that on December 19, 1997, calls were placed to several of Lamorte's clients from WNG's office. Walters, however, denies that during those conversations he informed Lamorte's clients that he was about to resign and denies that he attempted to solicit any of them.

At 9 a.m. on Saturday, December 20, Walters and Nixon telephoned Lamorte's Clark office and received no answer. They then drove to that empty office and spent two or three hours "putting away files and removing their personal belongings." At 2:56 p.m., Walters and Nixon faxed their respective resignation letters to Halpin's private office in Wilton, Connecticut. Because they thought that Halpin often worked Saturdays, they believed there was a possibility that the letters would be received that day. They also knew that once they resigned, Lamorte would be without a P & I claims adjuster in its Clark office.

On Sunday morning, December 21, Walters and Nixon began to fax solicitation letters and transfer authorization forms to all but one of Lamorte's P & I clients, thirty-three in all. On that first day, defendants exclusively targeted Lamorte's clients from whose files they had taken the client information noted earlier. A typical letter notified the client that defendants, who had been handling that client's claim file, had resigned from Lamorte and started a new business. It stated "Our fee structure will be *less* than Lamorte Burns' fee structure for 1998." The client was told that it had absolute discretion in deciding whether to continue with Lamorte or to have its claim files in progress transferred to WNG or to any other firm. The letter was accompanied by a transfer request form. The form included "a list of open files *we* have been handling for you." (emphasis added). In addition to the client's file number, the transfer form included the client's name, the name of the injured person, and the accident date. The client was instructed simply to mark an "X" next to each listed file that it wished to have transferred from Lamorte to WNG.

By Monday, December 22, 1997, ten of Lamorte's clients returned to WNG signed transfer authorization forms instructing Lamorte to transfer their active P & I claims to WNG. By January 7, 1998, all forms were returned and all thirty-three of Lamorte's P & I clients requested transfer of their active claim files to WNG, totaling a transfer of 116 individual Lamorte P & I claims. By the time the summary judgment motion was heard, 153 of Lamorte's 350 active P & I claim files had been transferred to WNG. According to Walters, the clients that had requested a transfer included clients he had brought into Lamorte, as well as clients that had been existing Lamorte clients when he arrived at the company. Walters conceded that "[he] had people faxing from up and down the Eastern Seaboard and from overseas within an hour or less of getting his sudden announcement." Customers were sending their congratulations.

## B.

Upon consideration of the summary judgment record, the trial court concluded that defendants had breached their duty of loyalty, tortiously interfered with an economic advantage, misappropriated confidential and proprietary information, and competed unfairly. The court accepted for purposes of the motion that defendants had not solicited any of plaintiff's clients prior to resignation. It also found that defendants removed only personal belongings from plaintiff's office and took no physical files, documents, Rolodex cards, or floppy disks, nor did they delete any of plaintiff's computer files. Nevertheless, the court found uncontroverted evidence sufficient to sustain plaintiff's motion. Specifically, the court focused on the nature of the information defendants took, including clients' names, addresses, telephone and fax numbers, file numbers, accident dates, details concerning the individual P & I claims, and billing rates. The court concluded that that information was shared between Lamorte and its clients; Lamorte's competitors did not have knowledge

of it. The information was confidential, and defendants were not at liberty to take it for their own business purposes.

The court also addressed the specific manner in which defendants proceeded to use the information in connection with their newly created, competitive business:

In this instance, the solicitation was not limited to such things as, look, we're a new company, we're going to now compete with Lamorte, we'd be interested in your business. The solicitation was far more specific than that; and, admittedly, based upon information that was confidential. . . . If you examine the solicitation, you will see that they didn't just ask generally for a customer's business. They asked for the work that was specifically being handled by the plaintiff, and on a case-by-case basis specifically mentioning the name of the claimant. . . . Effectively, what they said to the customer that they were soliciting is, look, we're dealing with the following cases right now for Lamorte, and we want them . . . [T]his was information [defendants] would not have generally known but for their employment with plaintiff. They wouldn't have known the specific file, the accident date. . . . And there isn't any dispute that that information came from the plaintiff.

The court noted that Walters admitted that the information gave him an advantage in soliciting the clients, that Halpin would not have authorized him to give the information to a competitor, and that he himself would fire any of his employees for divulging such information to a competitor. The court's conclusion that the information was confidential and proprietary led to its decision that defendants' use of it amounted to a breach of the duty of loyalty and tortious interference with plaintiff's economic advantage. Specifically, the court found that

there was a deliberate plan on the part of defendants to cause damage to plaintiff through the diversion of its customers, through stealth and deceit, at a time when defendants caused plaintiff to be most vulnerable, by soliciting plaintiff's customers over the weekend, while plaintiff had no idea that defendants had resigned until, at the very earliest, the following Monday morning . . . In furtherance of that plan, defendants then systematically and admittedly took detailed information known only to plaintiff's company, which this court has deemed proprietary for such purposes.

On appeal, the Appellate Division determined that there were material facts in dispute and reversed. The court emphasized the fact-sensitive nature of evaluating whether an employee's conduct in planning and preparing for future employment constitutes a breach of the duty of loyalty and whether the client claim information taken by defendant from Lamorte was confidential and pro-

prietary. The Appellate Division's conclusion was founded on defendants' assertions that they were never told that the information was confidential and proprietary, and that although the information was not generally available, it could have been obtained simply by sending out letters of solicitation to all of Lamorte's clients asking permission to have all files transferred, not just those files defendants were working on. The Appellate Division panel thus concluded that a more fully developed record was needed to determine whether the information was proprietary, "whether their manual copying of the customer account information while still employed was a violation of their duty or 'mere preparation,' and whether the manner in which they resigned and immediately undertook to solicit their employer's customers was impermissible competition in our current economic environment of 'free enterprise.' "

## II.

A threshold issue common to our analysis of plaintiff's tort claims concerns whether the client claim information taken from Lamorte by defendants was legally protectable. Defendants admit to gathering, while employed, information from plaintiff's P & I claim files, including clients' names, addresses, phone and fax numbers, claimant names, accident dates, details concerning the accidents, and file numbers, for the sole purpose of soliciting, once they resigned, those very clients they had been handling for plaintiff. With respect to Walters, the gathering and use of that information was directly contrary to the terms of his employment agreement. Even in the absence of an agreement, however, the law protects confidential and proprietary information.

■ In New Jersey, customer lists of service businesses have been afforded protection as trade secrets. *See AYR Composition, Inc. v. Rosenberg*, 261 *N.J.Super.* 495, 504, 619 *A.*2d 592 (App.Div. 1993) ("Where a service company is concerned, the names and addresses of its customers 'are not open to and ascertainable by everyone; they are private information and property' of the

company.") (quoting *Abalene Exterminating Co. v. Oser*, 125 *N.J.Eq.* 329, 332, 5 *A.*2d 738 (Ch.1939)); *see also* 1 Milgrim, *Milgrim on Trade Secrets* § 2.09 (1995) (stating that information relating to customers, merchandising, costs, and pricing may be considered trade secrets); 30 *C.J.S. Employer–Employee* § 126b (1992) (stating that customer list may be protected if treated in confidential manner, and time and money have been used in creating list); K.H. Larsen, Annotation, *Former Employee's Duty, in the Absence of Express Contract, Not to Solicit Former Employer's Customers or to Otherwise Use His Knowledge of Customer Lists Acquired in Earlier Employment*, 28 *A.L.R.*3d 7, 185 (1969) (listing cases in which insurance companies' customer lists have been held confidential and proprietary). In all instances, a substantial measure of secrecy must exist in order for information to be treated as a trade secret. *See Ingersoll–Rand Co. v. Ciavatta*, 110 *N.J.* 609, 636, 542 *A.*2d 879 (1988) (listing factors for determining whether information is a trade secret).

 Importantly, however, information need not rise to the level of a trade secret to be protected. In *Platinum Management, Inc. v. Dahms*, 285 *N.J.Super.* 274, 295, 666 *A.*2d 1028 (Law Div.1995), the court held that to be legally protected, the information need not constitute a trade secret, and indeed, may otherwise be publicly available. The key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information. *Ibid.* (citing *Zippertubing Co. v. Teleflex, Inc.*, 757 *F.*2d 1401, 1407–10 (3d Cir.1985)) (citing *Kamm v. Flink*, 113 *N.J.L.* 582, 175 *A.* 62 (E & A 1934)). In *Platinum*, plaintiff sued its former employee for breach of the duty of loyalty, claiming that its former employee discussed its customers with his new employer. Defendant argued that the information was not protectable because it was publicly available. *Ibid.* The court disagreed, and found that the information the plaintiff sought to protect went beyond mere names, but also included buying habits, mark-up structure, merchandising plans, projections, and product strategies. *Ibid.* The

court stated that the customer's names may have been listed in readily obtainable trade directories, but the fact that they were the plaintiff's customers was not. *Ibid.* The court concluded that the identity of the customers is "entitled to protection when divulged in confidence to a key employee ... where [defendant] is a party to a covenant not to compete." *Ibid.*

Other jurisdictions also have held that information not technically meeting the strict requirements of trade secrets may be protected as "confidential information" and may serve as the basis for a tort action. *See Roboserve, Ltd. v. Tom's Foods, Inc.,* 940 F.2d 1441, 1456 (11th Cir.1991)("[I]tem may be considered confidential in the context of a business relationship without rising to the level of a trade secret. A confidential relationship is distinguished by the expectations of the parties involved, while a trade secret is identified through rigorous examination of the information sought to be protected."); *Self Directed Placement Corp. v. Control Data Corp.,* 908 F.2d 462, 466–67 (9th Cir.1990) (quoting *Faris v. Enberg,* 97 Cal.App.3d 309, 158 Cal.Rptr. 704, 712 (1979)) (stating that idea, whether or not protectable, offered to another in confidence is not to be used by offeree for purposes beyond limits of confidence without offeror's permission); *Sandlin v. Johnson,* 152 F.2d 8, 11 (8th Cir.1945) (stating that business information not technically trade secret can be protected); *Crocan Corp. v. Sheller–Globe Corp.,* 385 F.Supp. 251, 254 (N.D.Ill.1974) (same); *see generally* Robert Unikel, *Bridging the 'Trade Secret' Gap: Protecting 'Confidential Information' Not Rising to the Level of Trade Secrets,* 29 Loy. U. Chi. L.J. 841 (1998) (surveying ways employers protect information that does not constitute trade secrets, including claims for breach of duty of loyalty and unfair competition).

Those cases follow the philosophy expressed in the *Restatement (Second) on Agency,* which states that "[u]nless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his

agency or in violation of his duties as agent, in competition with or to the injury of the principal. . . ." *Restatement (Second) of Agency* § 395 (1958). The comment to the *Restatement* adds that an agent must not take "unfair advantage of his position in the use of information or things acquired by him because of his position as agent or because of the opportunities which his position affords." *Id.* § 387 comment b.

■ We disagree with the Appellate Division's conclusion that a trial is needed to determine whether the information secretly gathered by defendants was legally protected. Although we are persuaded that the facts show that plaintiff's information should be entitled to trade secret protection, certainty in that regard is not essential to our decision. The specific information provided to defendants by their employer, in the course of employment, and for the sole purpose of servicing plaintiff's customers, is legally protectable as confidential and proprietary information.

The information surreptitiously gathered by defendants from plaintiff was not generally available to the public, but was shared between plaintiff and its clients. Defendants would not have been aware of that information but for their employment. The information went beyond the mere names of plaintiff's clients. It included specific information concerning the clients' claims, such as the name of the injured party, and the type and date of injury. Defendants admitted that that information gave them an advantage in soliciting plaintiff's clients once they resigned. But, the information was available to defendants for their use in servicing clients on behalf of Lamorte only.

The record is clear that defendants also knew that Lamorte had an interest in protecting that information. Walters signed an agreement that so stated, and both Walters and Nixon declined to sign a later agreement that sought to afford further protection to the information. Walters acknowledged that he would not have given such information to a competitor if requested, and he would not have permitted a Lamorte employee to do so. Also, Walters and Nixon both were aware that their co-employee John Treubig

had been fired because of his attempt to privately solicit La-morte's customers. We conclude, therefore, that the client claim file information taken by defendants was confidential and proprietary information belonging to plaintiff.

### III.

### A.

Having concluded that plaintiff's client claim file information is legally protectable, resolution of plaintiff's breach of the duty of loyalty claim is relatively straightforward. Loyalty from an employee to an employer consists of certain very basic and common sense obligations. An employee must not while employed act contrary to the employer's interest. *Chernow v. Reyes*, 239 *N.J.Super.* 201, 204, 570 *A.*2d 1282 (App.Div.), *certif. denied*, 122 *N.J.* 184, 584 *A.*2d 245 (1990) (citing *Auxton Computer Enters., Inc. v. Parker*, 174 *N.J.Super.* 418, 425, 416 *A.*2d 952 (App.Div. 1980)). And, during that period of employment, an employee has a duty not to compete with his or her employer. *Cameco, Inc. v. Gedicke*, 157 *N.J.* 504, 517–18, 724 *A.*2d 783 (1999); *Subcarrier Communications, Inc. v. Day*, 299 *N.J.Super.* 634, 644–45, 691 *A.*2d 876 (App.Div.1997); *United Bd. & Carton Corp. v. Britting*, 63 *N.J.Super.* 517, 524, 164 *A.*2d 824 (Ch.Div.), *aff'd*, 61 *N.J.Super.* 340, 160 *A.*2d 660 (App.Div.1960), *certif. denied*, 33 *N.J.* 326, 164 *A.*2d 379 (1960). Consistent with our approach to this common-law duty, the Restatement (Second) Agency provides that "[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." *Restatement (Second) of Agency*, § 393 (1958). Comment e to that section further states:

> [B]efore the end of his employment, [the employee] can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

[*Id.* § 393 comment e.]

■ In *Cameco, supra,* 157 *N.J.* at 517, 724 *A.*2d 783, the Court held that an employer may prove a prima facie case of an employee's breach of the duty of loyalty not only by showing that the employee directly competed with the employer while employed, but also by showing that the employee while employed assisted the employer's competitor. In evaluating an employee's conduct under the breach of the duty of loyalty standard, the employee's level of trust and confidence, the existence of an anti-competition contractual provision, and the egregiousness of the conduct are important factors to consider in the analysis. *Id.* at 516–18, 521, 724 *A.*2d 783. The analysis is not susceptible to "mechanical applications of abstract principles of law." *Id.* at 516, 724 *A.*2d 783. We commented on the varied contexts that give rise to claims of employee disloyalty and emphasized the fact-sensitive nature of their resolution. *Id.* at 516, 724 *A.*2d 783 ("In general, the adjudication of such claims summons rules of reason and fairness.").

■ Defendants maintain that they did not compete with Lamorte while employed essentially because no solicitations of Lamorte clients occurred until the day after they transmitted their resignations to plaintiff. They contend that they were doing no more than planning and preparing the establishment of a competing business for their future employment during the time they remained in Lamorte's employ. It is true that in New Jersey

[a]n employee who is not bound by a covenant not to compete after the termination of employment, and in the absence of any breach of trust, may anticipate the future termination of his employment and, while still employed, make arrangements for some new employment by a competitor or the establishment of his own business in competition with his employer.

[*Auxton Computer Enters. Inc., supra,* 174 *N.J.Super.* at 423, 416 *A.*2d 952.]

But, although an employee has the right to make preparations to start a competing business, the employee may not breach the undivided duty of loyalty he or she owes to his or her employer while still employed by soliciting the employer's customers or engaging in other acts of secret competition. *Platinum, supra,* 285 *N.J.Super.* at 303, 666 *A.*2d 1028 (citing *Auxton Computer*

*Enters., Inc., supra,* 174 *N.J.Super.* at 423, 416 *A.2d* 952). Many jurisdictions have held that an employee's taking of legally protected information from his or her employer, in order to seek a competitive advantage upon resignation, constitutes a breach of the duty of loyalty. *See, e.g., Abbott Redmont Thinlite Corp. v. Redmont,* 475 *F.*2d 85, 89 (2d Cir.1973) (stating that employee cannot "utilize specific information he obtained during his employment to deprive his ex-employer of customers with whom he knows deal is in process of completion"); *Tlapek v. Chevron Oil Co.,* 407 *F.*2d 1129, 1133 (8th Cir.1969) (finding that employee has duty not to use confidential information acquired in course of employment for own benefit and to detriment of former employer); *Bull v. Logetronics, Inc.,* 323 *F.Supp.* 115, 133 (E.D.Va.1971) (stating that employee's duty "does not cease when employment ends. He has a duty not to reveal confidential information obtained through his employment, and not to use such confidential information after he has left his employment."); *United Ins. Co. of Am. v. Dienno,* 248 *F.Supp.* 553, 557 (E.D.Pa.1965) (stating party who develops or possesses confidential information belonging to his employer should not be allowed to terminate his association and then use information to undercut former employer); *see also Unikel, supra,* 29 *Loy. U. Chi. L.J.* at 862 (stating strict fiduciary obligations imposed on employees prohibit them from using or disclosing to detriment of employer confidential information imparted to them in course of duties).

### B.

■ Based on the evidence in this record, we agree with the trial court that defendants breached their duty of loyalty. Defendants' conduct while employed was clearly contrary to the interests of their employer. We recognize the right of an employee to plan and prepare for future employment, but defendants' extraordinary actions were without question outside the rubric of that right. *Accord Sun Dial Corp. v. Rideout,* 16 *N.J.* 252, 260–61, 108 *A.*2d 442 (1954) ("There is undoubtedly ... an important policy which encourages employee [sic] to seek better jobs from other

employers or to go into business for themselves.... But there is also a policy which is designed to protect employers against improper disclosures of information which their employees have received in confidence.") (internal citations omitted).

An employee's duty of loyalty to his or her employer goes beyond refraining from privately soliciting the employer's customers while still employed. The duty of loyalty prohibits the employee from taking affirmative steps to injure the employer's business. Defendants purloined protected information from plaintiff's P & I claim files while still employed, for the sole purpose of effecting an advantage in competing with plaintiff immediately upon their resignation and the commencement of their new competitive business. Unlike the defendant in *Auxton Computer Enterprises, Inc., supra,* 174 *N.J.Super.* at 425, 416 *A.*2d 952, defendants here intentionally began a process of subverting their employer's business while still employed. That process included gathering by stealth plaintiff's legally protected information admittedly to seek an advantage in competing with plaintiff once they resigned. Obviously those actions were contrary to plaintiff's interest, and in the case of Walters, directly conflicted with the terms of his employment agreement as well, as the courts below held.

## IV.

### A.

Plaintiff also claims that defendants tortiously interfered with its economic advantage. An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation. *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 *N.J.* 739, 750, 563 *A.*2d 31 (1989). Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage. *Ibid.* To prove its claim, plaintiff must show

that it had a reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious interference, and that it suffered losses thereby. *Baldasarre v. Butler*, 132 *N.J.* 278, 293, 625 *A.*2d 458 (1993). Causation is demonstrated where there is "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefit." *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 *N.J.Super.* 140, 199, 659 *A.*2d 904 (App.Div.), *certif. denied*, 141 *N.J.* 99, 660 *A.*2d 1197 (1995) (quoting *Leslie Blau Co. v. Alfieri*, 157 *N.J.Super.* 173, 185–86, 384 *A.*2d 859 (App.Div.), *certif. denied sub nom., Leslie Blau Co. v. Reitman*, 77 *N.J.* 510, 391 *A.*2d 523 (1978)).

The tortious interference cause of action has a long history in New Jersey law. In *Van Horn v. Van Horn*, 56 *N.J.L.* 318, 28 *A.* 669 (1893), the Court stated that

> while a trader may lawfully engage in the sharpest competition with those in like businesses by holding out extraordinary inducements, by representing his own wares to be better and cheaper than those of others, yet when he oversteps that line and commits an act with the malicious intent of inflicting injury upon his rival's business, his conduct is illegal, and, if damage results from it, the injured party is entitled to redress.

> *[Id.* at 323, 28 *A.* 669.]

Malice is not used here in its literal sense to mean "ill will;" rather, it means that harm was inflicted intentionally and without justification or excuse. *Ideal Dairy Farms, Inc., supra*, 282 *N.J.Super.* at 199, 659 *A.*2d 904. It is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented. *Ibid.* Often it is stated that the relevant inquiry is whether the conduct was sanctioned by the "rules of the game," for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury. *Ibid.* The conduct must be both "injurious and transgressive of generally accepted standards of common morality or of law." *Harper–Lawrence, Inc. v. United Merchants and Mfrs., Inc.*, 261 *N.J.Super.* 554, 568, 619 *A.*2d 623 (App.Div.), *certif. denied*, 134 *N.J.* 478, 634 *A.*2d 525 (1993)

(quoting *Di Cristofaro v. Laurel Grove Mem'l Park*, 43 *N.J.Super.* 244, 255, 128 *A.*2d 281 (App.Div.1957)). The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage. *Ideal Dairy Farms, Inc., supra*, 282 *N.J.Super.* at 205, 659 *A.*2d 904.

▮▮▮▮ Although competition may constitute a justification, a defendant claiming a' business-related excuse must justify not only its motive and purpose, but also the means used. *Id.* at 199, 659 *A.*2d 904. Conduct admittedly spurred by spite and ill-will is not necessarily sufficient to sustain an action for tortious interference with an economic advantage. In *Ideal Dairy Farms, Inc.*, the plaintiff, a dealer and distributor of dairy products, terminated its relationship with Farmland and started a relationship with Farmland's competitor, Tuscan. *Id.* at 151–52, 659 *A.*2d 904. Farmland, upset with this new arrangement, canvassed Ideal–Tuscan's customers and offered to sell them milk at prices substantially lower than Ideal's prices. *Id.* at 152, 659 *A.*2d 904. As a result, Ideal lost customers, and those that it retained purchased milk at substantially lower prices. *Ibid.*

The Appellate Division reversed the trial court's finding that Farmland had tortiously interfered with Ideal's economic advantage. *Id.* at 155, 659 *A.*2d 904. The court was unpersuaded that the defendant had acted with malice even though it had been shown that Farmland had targeted Ideal's customers by setting prices so low as to be unprofitable. *Ibid.* The evidence showed rivalry and rank animosity between the two companies, but not conduct that transgressed the rules of the game. *Ibid.* The court explained:

[T]here was also a valid business justification supporting Farmland's conduct. Farmland had lost a significant amount of sales after Ideal switched suppliers to Tuscan. Faced with excess plant capacity, and a decline in sales, there was a legitimate business reason to 'target' Ideal customers and attempt to regain what Farmland lost the previous year (1985) regardless of any other motivation. .

[*Id.* at 200–01, 659 *A.*2d 904.]

▮▮▮ On the other hand, not all sanctioned conduct or customs of a specific industry will be immune from claims for tortious

interference. In *Wear–Ever Aluminum, Inc. v. Townecraft Industries, Inc.*, 75 *N.J.Super.* 135, 182 *A.*2d 387 (Ch.Div.1962), Wear–Ever claimed that Townecraft tortiously pirated approximately thirty-five members of its sales force, and therefore interfered with Wear–Ever's contractual and advantageous relationship with its employees. *Id.* at 139, 182 *A.*2d 387. Townecraft had called a meeting and invited Wear Ever's sales force in an attempt to persuade them to work for Townecraft. *Id.* at 141, 182 *A.*2d 387. The defendant contended that its conduct was prevalent in the trade. *Id.* at 146–47, 182 *A.*2d 387. In ruling for the plaintiff, the court stated that

> even if the defendant had established that the custom in the trade was to pirate salesmen from competitors, this court would not permit such a custom to justify and legitimatize what otherwise would be tortious conduct. The role of the court is to raise the standard of business morality and care, not judicially to sanction tortious activities. Higher standards benefit and protect both the innocent member of the industry and the general public.
>
> [*Ibid.*]

### B.

 Walters and Nixon gathered and used Lamorte's protected information to effect a surprise weekend coup, secretly soliciting Lamorte's clients at a time when Lamorte's knowledge of their competition was delayed, to put a best light on the tactic. That confidential and proprietary information was provided to defendants only for the purpose of servicing clients on behalf of Lamorte, not to solicit those clients away from Lamorte.

At the time of defendants' "weekend surprise," plaintiff enjoyed a relationship with over thirty P & I clients. Those clients were obtained on Lamorte's time and at its expense. Lamorte's clients were then solicited and acquired by defendants' secretive taking of plaintiff's protected client information, and their ensuing strategically timed resignation and solicitation campaign. Those acts clearly indicate malice. Defendants' conduct was not only unethical, but also unlawful in that it constituted the wrongful taking of Lamorte's property.

We respect the principles of free competition, but defendants' taking of plaintiff's confidential and proprietary property and then using it effectively to target plaintiffs' clients, is contrary to the notion of free competition that is fair.

## V.

For the reasons expressed herein sustaining plaintiff's claims of breach of the duty of loyalty and tortious interference with an economic advantage, and as expressed in the trial court's opinion, we conclude that plaintiff is entitled to summary judgment on its other tort claims, namely that defendants misappropriated plaintiff's confidential and proprietary information and committed unfair competition. Under the facts here, all proofs essential to those latter two claims are subsumed in the proofs required to support the claims for breach of loyalty and tortious interference with an economic advantage. Accordingly, the judgment of the Appellate Division is reversed, in part, and the judgment of the Chancery Division sustaining plaintiff's tort claims is reinstated.

*For reversal in part and reinstatement*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.