9 A.3d 1106 (2008)
417 N.J. Super. 412
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, and New Jersey Education Association, Plaintiffs,
v.
John McCORMAC, Treasurer, State of New Jersey; State of New Jersey Department of the Treasury; Barbara O'Hare, Manager, Government Records Access Unit, Defendants, and
Blackstone Capital Partners, V, L.P.; BCP V-S, L.P.; Oak Hill Capital Partners, II, L.P.; Quadrangle Capital Partners II, L.P.; and Warburg Pincus IX, LLC, Defendants/Intervenors.
No.:L-3217-05 CIVIL ACTION
Superior Court of New Jersey, Law Division, Mercer County.
Decided March 5, 2008.
*1109 Annmarie Pinarski, Somerset, for the plaintiff Communications Workers of America (Weissman & Mintz, attorneys; Ms. Pinarski and Steven P. Weissman, on the brief).
Richard A. Friedman, Newark, for the plaintiff New Jersey Education Association (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Mr. Friedman and Aileen O'Driscoll, on the brief).
Anne Milgram, Attorney General, for the defendant (Julian Gorelli, Deputy Attorney General, of counsel; Lewis Scheindlin, Assistant Attorney General, Joshua S. Lichtblau, Assistant Attorney General, and Rubin D. Weiner, Deputy Attorney General, on the brief).
James M. Hirschhorn, Newark, for the intervenors (Sills Cummis Epstein & Gross, attorneys; Mr. Hirschhorn, on the brief).
FEINBERG, A.J.S.C.
Plaintiffs, Communication Workers of America, AFL-CIO ("CWA") and New Jersey Education Association ("NJEA") ("plaintiffs") seek to compel disclosure of investment agreements and side letters under the Open Public Records Act ("OPRA") and the common law right of access. The defendants are John McCormac, Treasurer of the State of New Jersey, and Barbara O'Hare, manager of the Government Records Access Unit ("defendants"). Defendants denied the request for disclosure on the grounds that: (1) the documents contain trade secret and proprietary commercial or financial information exempt from disclosure under N.J.S.A. 47:1A-1.1; (2) the documents contain information which, if disclosed, would give an advantage to competitors or bidders and, therefore, are exempt from disclosure under N.J.S.A. 47:1A-1.1; and (3) the public need for confidentiality out-weighs *1110 the plaintiffs' interest in disclosure under the common law.
The nine documents include agreements of limited partnership (collectively, the "Partnership Agreements") for each of the five partnerships: (1) Blackstone Capital Partners, V, L.P.; (2) Blackstone Capital Partners, V-S, L.P.; (3) Oak Hill Capital Partners, II, L.P.; (4) Quadrangle Capital Partners, II, L.P.; and (5) Warburg Pincus Private Equity, IX, L.P. (collectively, the "Funds") and four letter agreements (collectively, the "Side Letters)" between Common Pension Fund E (the common trust fund through which the New Jersey Division of Investment ("DOI") invests pension fund assets in alternative investments) and the Funds and/or the respective general partners of the Funds. N.J.S.A. 52:18A-89; N.J.A.C. 17:16-69, 71, 90, 100.
CWA is the exclusive collective negotiations agent for approximately 50,000 public employees throughout New Jersey, a majority of whom are members of the Public Employees' Retirement System ("PERS"). NJEA is a labor organization that represents the professional and economic interests of approximately 175,000 active and 18,835 retired employees of school districts and provides assistance and support to the majority of representatives of school employees in New Jersey. Nearly all of its members or retirees receive pensions from the Teachers' Pension and Annuity Fund ("TPAF"). The PERS and TPAF, along with three other New Jersey State pension funds, hold approximately $79 billion in pension system assets that the DOI manages in various investment vehicles. N.J.A.C. 17:16-69.1.
Historically, employees of the DOI invested these monies in variable return securities and public fixed-income, i.e., stocks and bonds. However, following the lead of other states investing with and benefiting from partnerships with private equity firms, New Jersey adopted an Alternative Investments Program ("AIP"). N.J.S.A. 52:18A-89. Under the AIP, the Common Pension Fund E was created. The Common Pension Fund E contains the commingled assets of five New Jersey pension funds: (1) the Police and Firemen's Retirement System; (2) the PERS; (3) the State Police Retirement System; (4) the TPAF; and (5) the Judicial Retirement System of New Jersey. The AIP authorizes the DOI to invest a portion of the Common Pension Fund E in alternative investment classes including private equity, real assets and absolute return strategies. N.J.S.A. 52:18A-59; N.J.A.C. 17:16-69, -71, -90, -100.
The AIP authorizes DOI to become a limited partner in a private equity fund for which a general partner, who is not an employee of the State, makes the day-to-day investment decisions. Furthermore, the Federal Securities and Exchange Commission ("SEC") exempts private equity funds from the disclosure requirements of the Securities Act of 1933. 17 C.F.R. § 230.506. Specifically, Rule 506 only requires private equity funds to provide identifying information, the number of investors, the dollar amount of securities sold, the expenses of issuance, and a general statement of the intended use of the proceeds. This exemption promotes the policy of allowing a small number of sophisticated investors to pursue investments without revealing their strategies to the public. The State, through its Common Pension Fund E, is considered one such sophisticated investor.
Currently, the State is a limited partner of a number of partnerships with private equity firms as general partners. To create each limited partnership, a general partner negotiates with the State to draft a partnership agreement. According to *1111 William Clark, the Director of the DOI, each agreement "sets forth the name of the fund[ ] and the name of its general partner and/or investment advisor." The agreements give the purpose and duration for each fund. They detail the investment strategies of the general partners and establish boundaries for what types of investments may be made and how much the general partner may invest in each. They set forth how long the general partner may hold a particular investment and outline contingency plans for disruptions to the ordinary management of the fund. The agreements also set forth an accounting convention, how to allocate profits and losses of a fund, and how to address tax issues. Finally, they establish the fees for managing the fund and what happens in case a partner violates the terms of the agreement.
Once the general partner drafts the partnership agreement for a particular fund, the general partner and the State must negotiate a supplemental agreement to address the peculiar needs of the State. Specifically, the so-called "side letter agreement" gives the State a seat on the advisory board, acknowledges the State's status as a tax-exempt entity, sets out additional notice and reporting requirements, establishes limitations on indemnity and liability and incorporates provisions regarding the State Investment Council's ("SIC") Policy Concerning Political Contributions and Prohibitions on Investment Management Business.[1] The side letter agreement also notes plaintiffs' pending appellate litigation challenging the legality of the regulations authorizing the AIP, Communications Workers of America v. McCormac, Docket No. A-5198-04T1.
In addition, the partnership agreements and the side letter agreements establish the confidentiality of a particular fund, allowing only three employees of the DOI and its Director to have access to the entirety of the agreements. According to Clark, these confidentiality terms allow the SIC, now a thirteen-member body that includes two union representatives, to obtain "a summary of the material terms of the State's investment in each fund, including the name and type of the fund, the size and geographic focus of the fund, a general description of the fund's investment strategy, the term of the fund and the investment period, the amount of the State's commitment, and the management fee paid to the fund."
On June 21, 2005, CWA submitted requests pursuant to OPRA and the common law right of access for all contracts and proposed contracts the DOI or the Department of Treasury had with the private equity funds. On June 23, 2005, NJEA submitted an identical request. The requests were assigned reference numbers C15543 and C15802, respectively.[2]
Between June 23, 2005, and October 12, 2005, the parties engaged in a series of correspondence. As part of these communications, the defendants requested additional time to respond to the requests and requested a special service fee of $15,803.78 for the production of the documents.[3] Specifically, the State estimated a *1112 time period of approximately 500 hours of staff time to produce the 36,000 pages of documents responsive to the OPRA requests: In response, plaintiffs requested a breakdown of the charges, challenged the special service fee as excessive, and objected to the time frame to produce some of the documents.
By letter dated October 12, 2005, the State provided a Vaughn index. See Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). While the Vaughn index identified thirteen documents, the State represented that nine were exempt from disclosure for the following reason:
Applicable Exemptions: Trade secret and proprietary commercial or financial information; information which, if disclosed, would give an advantage to competitors or bidders; and the public need for confidentiality outweighs the interest in disclosure. N.J.S.A. 47:1A-1.1; N.J.S.A. 47:1 A-8.
The nine documents withheld are:
(1) December 12, 2004, Amended and Restated Agreement of Limited Partnership of Oak Hill Capital Partners II, L.P. (OHCP II);
(2) March 17, 2005, Amended and Restated Limited Partnership Agreement of Quadrangle Capital Partners II, LP (QCP II);
(3) June 15, 2005, Amended and Restated Agreement of Limited Partnership of Warburg Pincus Private Equity IX, L.P. (WPPE IX);
(4) July 15, 2005, Letter agreement between Common Pension Fund E and OHCP II;
(5) August 2, 2005, Letter agreement between Common Pension Fund E and Warburg Pincus IX, LLC;
(6) August 8, 2005, Letter agreement between Common Pension Fund E and Quadrangle GP Investors II, LP;
(7) October 14, 2005, Amended and Restated Agreement of Limited Partnership of BCP V;
(8) October 14, 2005, Amended and Restated Agreement of Limited Partnership of BCP V-S, L.P; and
(9) October 14, 2005, Letter agreement between Common Pension Fund E and BCP V.[4]
On December 5, 2005, plaintiffs filed a three-count complaint. The complaint asserts: (1) no exemptions apply to the June 21, 2005, and June 23, 2005, requests; (2) the special service fee charged by defendants is excessive, unreasonable and in violation of OPRA; and (3) the denial violates the common law right of access to government records. The prayer for relief requests: (1) release of the records identified in the June 21, 2005, and June 23. 2005, record requests; (2) an award of attorney fees; and (3) any such other relief the court deems just and equitable.
On January 30, 2006, the State filed an answer, denying the allegations and asserting numerous affirmative defenses. On February 16, 2006, the private equity firms filed a motion to intervene. R. 4:33-1. Unopposed, the motion was granted on March 17, 2006, and an answer was filed on March 31, 2006.[5]
On June 23, 2006, the court conducted a case management conference, established a briefing schedule, and entered an order to permit discovery. The scheduling order *1113 was modified on a number of occasions due to the related matter before the Appellate Division, Communications Workers of America v. McCormac, Docket No. A-5198-04T1. After establishing a final briefing schedule, the court scheduled oral arguments for June 22, 2007.
On May 11, 2007, the court entered an order for production, under seal, of the nine documents and for an in camera review. Defendants provided these documents on May 22, 2007. On June 18, 2007, the court entered a consent order for answers each defendant intervenor provided to interrogatories that were designated as confidential. The protective order: (1) permitted plaintiffs to utilize the answers in any briefs and at oral argument; (2) prohibited anyone from accessing the answers other than plaintiffs' counsel and associated attorneys, employees of plaintiffs' counsel of record and other designated non-party experts; (3) prohibited any private equity firms from accessing the answers of another private equity firm without approval from the court; (4) ordered the private equity firms to justify their designations of confidentiality in any answer; (5) required plaintiffs to file under seal any briefs using answers deemed confidential and to notify defendants and the court, one day in advance and on the day of oral argument, respectively, whether any answers designated confidential would be used at oral argument; (6) permitted any party to apply to continue, modify or vacate the order consistently with the final judgment in this action; and (7) allowed plaintiffs to reserve the right to submit an application to seek additional discovery.
On October 11, 2007, in writing, defendants acknowledged the request by the court to review each agreement, for possible redaction, and to provide a more detailed Vaughn index. After several requests to extend the time to complete the aforementioned tasks, defendants submitted the redacted documents and a new Vaughn index on December 27, 2007. Subsequently, the court set oral argument for February 26, 2008. The parties filed supplemental briefs on March 4, 2008.
The court must address two issues: (1) whether defendants properly denied access to the partnership and side letter agreements under OPRA because they constitute (a) proprietary commercial or financial information, (b) trade secrets of (c) information, which, if disclosed, would give an advantage to competitors; and (2) assuming the partnership agreements and side agreements are exempt under OPRA, whether plaintiffs are entitled to access under the common law. The court will also discuss the application of the redaction language in OPRA as it applies to documents not considered government records and deemed confidential.

1. OPEN PUBLIC RECORDS ACT("OPRA")
OPRA provides that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions. . . ." N.J.S.A. 47:1A-1. Moreover, public policy requires courts to construe narrowly OPRA's limitations on the right to access government records. Ibid.; Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535, 874 A.2d 1064 (2005); Libertarian Party of Cent. New Jersey v. Murphy, 384 N.J.Super. 136, 139, 894 A.2d 72 (App.Div.2006).
OPRA defines a government record as: any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained *1114 or kept on file . . . or that has been received in the course of his or its official business. . . .
[N.J.S.A. 47:1A-1.1.]
OPRA narrows this general definition by naming classes of records that do not qualify as government records under OPRA. These include:
trade secrets and proprietary commercial or financial information obtained from any source. For the purposes of this paragraph, trade secrets shall include data processing software obtained by a public body under a licensing agreement which prohibits its disclosure;
information which, if disclosed, would give an advantage to competitors or bidders;
[Ibid.]
When an agency invokes exemptions such as the ones above and denies a citizen access to requested records, "the custodian shall indicate the specific basis therefor on the request form and promptly return it to the requestor." N.J.S.A. 47:1A-5(g). OPRA further provides that "[a] person who is denied access to a government record by the custodian of the record, at the option of the requestor, may . . . institute a proceeding to challenge the custodian's decision by filing an action in Superior Court. . . ." N.J.S.A. 47:1A-6. During the proceeding, the records custodian bears the burden to show that OPRA authorizes nondisclosure of the requested records. Finally, if defendants fail to justify denying the record, the court shall order that plaintiff have access and award a reasonable attorney's fee. Ibid.

A PROPRIETARY COMMERCIAL OR FINANCIAL INFORMATION
Defendants submit the disputed documents contain proprietary commercial or financial information. OPRA provides that:
[a] government record shall not include the following information which is deemed to be confidential . . .: trade secrets and proprietary commercial or financial information obtained from any source. For the purposes of this paragraph, trade secrets shall include data processing software obtained by a public body under a licensing agreement which prohibits its disclosure. . . .
[N.J.S.A. 47:1A-1.1.]
Before addressing whether defendants properly invoked this exemption, the parties have raised a preliminary question of statutory interpretation: what records did the drafters of OPRA intend to protect under this exemption; or, what qualifies as proprietary commercial or financial information? Neither of these terms is defined in OPRA and there are no reported decisions, in New Jersey, interpreting the exemption.
Courts interpret words in a statute according to their plain meaning. White v. Mattera, 175 N.J. 158, 165, 814 A.2d 627 (2003); Town of Morristown v. Woman's Club of Morristown, 124 N.J. 605, 610, 592 A.2d 216 (1991); Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 128, 527 A.2d 1368 (1987). Plain meaning has been defined as the "ordinary and well-understood" meanings. Great All & Pac. Tea Co. v. Borough of Point Pleasant, 137 N.J. 136, 143, 644 A.2d 598 (1994).
As a result, applying the plain meaning of the statute, defendants argue "proprietary commercial and financial information from any source" is not a government record under OPRA even if the documents are in the possession of a public agency. Under OPRA's predecessor, the Right to Know Law, proprietary commercial and financial information was not exempt from disclosure. In HIP of New Jersey, Inc. v. *1115 Dep't of Banking and Ins., 309 N.J.Super. 538, 707 A.2d 1044 (App.Div.1998), the court applied the Right to Know Law to certain proprietary commercial and financial information, and ordered disclosure. To override that decision, the Legislature amended New Jersey's freedom of information act to explicitly contain an exemption for proprietary commercial or financial information.
Plaintiffs argue the partnership agreements and side letters lost their proprietary status upon disclosure to the State for the purposes of negotiating and entering the agreement. This argument is not persuasive. If adopted, the consequence would be that all government contracts would be subject to disclosure under OPRA, even when the parties have gone to great lengths to ensure the confidentiality of the information.
Most importantly, defendants represent that the partnership agreements and side agreements are developed by the Funds, the Funds do not disclose them to the general public and the documents contain proprietary commercial or financial information. Here, defendants have provided the court with briefs, affidavits, Vaughn indices and the subject documents.
Plaintiffs submit this approach is too broad and frustrates the purpose of OPRA inasmuch as N.J.S.A. 47:1A-1 provides that "any limitations on the right of access. . . shall be construed in favor of the public's right of access . . ." Plaintiffs argue the proper scope of the exemption is contained in the Freedom of Information Act (FOIA) protecting "trade secrets and commercial or financial information obtained from a person and privileged or confidential . . ." 5 U.S.C. § 552(b)(4).
Generally, federal case law tests whether a record meets exemption (b)(4) according to three elements. In Nat'l Parks & Conservation Assoc. v. Morton, 498 F.2d 765 (D.C.Cir.1974), the court considered disclosure of records pertaining to concessions operated within national parks to determine whether these records were "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." Id. at 766. The parties agreed that the records met elements (a) and (b) of the exemption but contested their characterization as "`confidential' within the meaning of the exemption." Ibid.
A federal court, applying the FOIA standard considers whether requested records are: (a) proprietary; (b) commercial or financial; and (c) confidential for the purpose of the FOIA. This three-step analysis does not apply in New Jersey. In New Jersey, by contrast, the plain language of OPRA identifies only two of those elements: (a) proprietary and (b) commercial or financial. When the party denying access proves those elements, the record is "deemed to be confidential for the purposes of [OPRA]." N.J.S.A. 47:1A-1.1. Manifestly, under OPRA, confidentiality attaches as a consequence of a record being proprietary and commercial or financial; in other jurisdictions, confidentiality is a precondition, along with proprietary and commercial or financial, for non-disclosure. This significant difference in terminology and phrasing signals no legislative intent to add a confidentiality requirement to OPRA for proprietary commercial or financial information.
Moreover, given the volume of case law interpreting "confidentiality" in the FOIA, the court assumes the Legislature understood the standards under the FOIA and the decision to omit the term "confidential" as a requirement for nondisclosure was deliberate. As confidentiality is not a precondition for nondisclosure under OPRA for proprietary commercial or financial information, the National Parks *1116 test does not apply. Cf. Ayres v. Dauchert, 130 N.J.Super. 522, 529, 328 A.2d 1 (App.Div.1974) (presuming that if the Legislature changes long-existing, judicially-construed language in its own statutes, it rejects those judicial constructions). Thus, the proper application of the exemption asks whether the records are (a) proprietary (b) commercial or financial information (c) obtained from any source.
Plaintiffs argue this test will exempt more records from disclosure than the Legislature intended. However,
[W]hen interpreting a statute, our overriding goal must be to determine the Legislature's intent. As a general rule, the Court must first look to the plain language of the statute. If that language is clear on its face, the sole function of the court[ ] is to enforce it according to its terms.
[White, supra, 175 N.J. at 165, 814 A.2d 627.]
OPRA excludes from the definition of government record all "proprietary commercial and financial information and "deems" all such information to be confidential. N.J.S.A. 47:1A-1. As noted heretofore, the Legislature is presumed to be aware of the federal statute, and it chose not to adopt the federal statutory language.
In any event, the federal courts exempt private commercial information from disclosure under the FOIA if the disclosure would impair the government's ability to obtain such information in the future, or disclosure will cause substantial harm to the competitive position of the person from whom the information was obtained. Nat'l Parks, supra, 498 F.2d at 770.
Because experience demonstrates that private equity funds will not accept investment from government investors if their confidential information becomes subject to compelled public disclosure, such disclosure will impair the ability of the State to enter investment agreements with private equity funds by diminishing the number that will accept the State's business. Whether or not the FOIA is used as a guide to interpret OPRA, the investment agreements are exempt from disclosure in New Jersey and under the FOIA, Exemption 4, as well.
The District of Columbia, which created the test, held that when a private party voluntarily provides commercial information, the information is exempt from disclosure under 5 U.S.C. Section 552(b)(4) if the private party who submitted it would not ordinarily disclose it to the public. See Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879-80 (D.C.Cir.1992) (en banc).
The Critical Mass exception is consistent with the National Parks test. If the information has been provided voluntarily, and if the entity has proved it would not ordinarily release the information to the public, then compelled release means that the private entity will stop providing the information voluntarily. This lack of cooperation will, as National Parks put it, "impair" the ability of the government to obtain information. Whether or not the National Parks test is read into OPRA, the evidence in this case, with respect to the industry, demonstrates that the investment agreements are not subject to disclosure.
The sole function of the court is to enforce a statute according to its terms. The court rejects the notion by the plaintiffs that the plain language of OPRA created an overly broad exemption. That argument in essence invites the court to judicially redraft the legislation to correct and alter the plain language of the statute. Redrafting legislation is a job for the legislative branch, not the judiciary.
*1117 While courts have the authority to appoint an independent expert or special master to provide assistance, and the court initially considered this possibility, upon further review, the court is satisfied that option is not warranted. R. 4:41-1. In this case, the parties have filed lengthy briefs and certifications, and appeared for oral argument. Furthermore, the court has, in camera, reviewed the documents. On this record and, given the summary and expedited nature of these proceedings, the court is satisfied the record contains sufficient facts and information, applying the plain meaning of the terms to the appropriate legal standards, to decide the case without the assistance of a third-party professional.
The American Heritage Dictionary of the English Language provides the following definitions: Proprietary: "1. Of, relating to, or suggestive of a proprietor or to proprietors as a group: had proprietary rights; behaved with a proprietary air in his friend's house. 2. Exclusively owned; private: a proprietary hospital. 3. Owned by a private individual or corporation under a trademark or patent: a proprietary drug." The American Heritage Dictionary of the English Language 1453 (3d ed. 1996). Clearly, from this definition, proprietary denotes something privately owned and not communally shared.
Commercial information, according to its plain meaning is information that "relate[s] to commerce," id. at 380, and "financial" information is information "of, relating to, or involving finance, finances, or financiers," id. at 682. Commerce means "an interchange of goods or commodities . . .; trade; business." Dictionary.com, Unabridged, http://dictionary.reference.com/ browse/commerce (last visited Dec. 14, 2010). "Finance" means "the management of money, banking, investments and credit." The American Heritage Dictionary of the English Language, supra, at 682. In sum, information is commercial if it is or relates to trade or business, and information is financial if it is or relates to the management of money, banking, investments and credit.
Additionally, in Lamorte Burns & Co. v. Walters, 167 N.J. 285, 299-301, 770 A.2d 1158 (2001), the Court suggested a three-part test to determine whether certain information constitutes proprietary commercial or financial information: (1) a party has expended its resources developing the information; (2) the information is not generally disclosed to the public; and (3) if the information is disclosed, it is disclosed for a limited purpose with a provision for confidentiality.
The Director of DOI and representatives of defendant intervenors have provided certifications. The certifications, coupled with the in camera inspection of the records, amply establish that the agreements consist of proprietary and commercial or financial information.
With regard to the partnership and side letter agreements between the State and defendant intervenor Blackstone, Kenneth C. Whitney, Blackstone's Senior Managing Director, asserts the proprietary nature of Blackstone's investment agreements:
(1) The provisions of the Investment Agreements embody approximately 18 years of experience by Blackstone in the business of private equity investment.
(2) [Blackstone] has rigorously policed the confidentiality of terms governing the investment partnerships it has sponsored.
(3) Blackstone has spent significant time and cost developing and implementing the terms of [the] Investment Agreements. . . . This effort has consisted of many years of diligent work by the general partner and the principals as well as *1118 numerous legal and tax advisors and consultants.
(4) Declining to protect the Investment Agreements from disclosure would abrogate the strict confidentiality Blackstone has carefully established an enforced concerning the terms of the Investment Agreements.
(5) The Investment Agreements are not publicly available, and are delivered in confidence to Common Pension Fund E as a limited partner.
(6) The information contained in the Investment Agreements is provided to Blackstone employees and agents only on a need to know basis and to those persons whose function within the organization requires the knowledge of that specific information in the course of their business.
(7) The side letter agreements are not generally available to all limited partners of the funds. Only those limited partners that are given "most favored nation" status are provided with all side letter agreements.
(8) The Investment Agreements contain express confidentiality provisions obligating each limited partner to maintain the confidentiality of the terms of the Agreements and non-public information regarding the general partner and the partnership, "except as otherwise required by law."
(9) While the partnerships' Certificates of Limited Partnership are publicly filed with the Secretary of State in Delaware, the investment agreements themselves are not publicly filed.
(10) In circumstances where certain counter-parties of the funds have a legitimate business purpose to review the Investment Agreements (e.g., creditors), in each such instance the counter-party is first required to agree to keep the Investment Agreements confidential.
In his certification, Whitney also includes the trade, investing and commercial and financial matters in the agreements:
(1) Disclosure of the . . . Investment Agreements would enable a competitor of Blackstone to ascertain, among other things, (i) the structure and size of the Funds, (ii) its investment criteria and strategy, (iii) investment limitations, (iv) co-investment rights, (v) limited partner rights/obligations to opt-out of proposed investments, (vi) general partner and investment adviser compensation and other internal governance matters, and other key terms.
(2) Many of Blackstone's independently developed structures for dealing with the complexities of modern private equity investing are embedded in its private equity partnership agreements.
Taken as a whole, these assertions establish that the partnership and side letter agreements with Blackstone are the proprietary commercial or financial information of Blackstone.
With regard to the partnership and side letter agreements between the State and defendant intervenor Warburg Pincus, W. Bowman Cutter, Managing Director, asserts the proprietary nature of the partnership and letter agreements:
(1) The Investment Agreements contain confidential commercial and financial information that are not disclosed to competitors or to other members of the public. Only Warburg Pincus limited partners, members of Warburg Pincus and Warburg Pincus' agents, employees and attorneys are provided the information on a need-to-know basis.
(2) The Investment Agreements . . . are not subject to public disclosure under the federal security laws.
(3) Warburg Pincus requires all investors in its limited partnership interests *1119 to agree in writing that they will not disclose the provisions of the Investment Agreements. Warburg Pincus will not accept investment by persons who will not agree to stringent confidentiality rules. This requirement is in accord with the industry practice for such investment partnerships.
In his certification, Cutter also describes the trade, investing and other commercial and financial matters in the agreements:
(1) [The] information includes (i) provisions of the Investment Agreements relating to certain tax matter affecting Warburg Pincus and its limited partners, (ii) information on Warburg Pincus' investment structure and specific investment authority and limitations, (iii) the detailed mechanism for allocating profits and losses between WP IX LLC, as the general partner, and the limited partners, including upon liquidation, (iv) provisions governing various obligations of the general partner, (v) the detailed mechanism for calculating distributions, and (vi) rules governing the treatment of fees and expenses . . ., [ (vii) the] ability to create other funds or make other investments, [ (viii) ] provision relating to the implementation of alternative investment structures, [ (ix) ] governance rights and restrictions on personnel changes at the general partner, and [(x) ] valuation procedures and reporting obligations.
(2) Public disclosure of . . . the Investment Agreements would reveal to [competitors] proprietary and sensitive information, confidential methods, business practices and strategies.
(3) Disclosure of [the Agreements]. . . would allow other funds a window into Warburg Pincus' strategy and the ability to anticipate or thwart that strategy.
These representations establish that the partnership and side letter agreements are the proprietary commercial or financial information of Warburg Pincus.
With regard to the partnership and side letter agreements between the State and defendant intervenor Oak Hill Capital Partners, Gregg Rubin, General Counsel of Oak Hill Capital Partners II, L.P., asserts the proprietary nature of the partnership and letter agreements:
(1) The terms and provisions of the investment agreements, which distinguish Oak Hill from other private equity funds, were the result of considerable effort on the part of Oak Hill, both with respect to financial expense and intellectual capital, as well as intense negotiations with investors.
(2) While Oak Hill's Certificate of Limited Partnership is filed publicly with the Secretary of State in Delaware, the Investment Agreements themselves are not filed publicly with any government office or agency.
(3) [E]ach partner in Oak Hill must execute Oak Hill's Partnership Agreement, which generally requires that each such partner keep confidential and not disclose any information contain in the Investment Agreements or any other information considered by Oak Hill to be of a confidential nature.
(4) The information contained in the Investment Agreements is considered highly sensitive and is the result of significant resources expended by the general partner, as well as the unique expertise of individuals employed by the General Partner.
(5) To preserve its value and the General Partner's investment in creating and negotiating the Investment Agreements, the confidentiality of the information contained therein is carefully guarded by the General Partner.

*1120 (6) The information contained in the Partnership Agreement is made available only to partners of Oak Hill, pursuant to terms whereby the recipients agree to maintain the information in strict confidence.
(7) The information contained in the Letter Agreement is only made available to partners that request to review the Letter Agreement pursuant to the "most favored nations" provision in the Partnership Agreement.
(8) The Investment Agreements are only made available to third parties in very rare circumstances and generally only to persons subject to confidentiality obligations similar in all material respects to the confidentiality provision in the Partnership Agreement.
(9) If the Investment Agreements were released to the public, then competitors could "free-ride" on Oak Hill's efforts by producing identical documents while expending relatively few resources.
(10) If all or a portion of the Investment Agreements are disclosed, the details of Oak Hill would be revealed not only to competitors but also to potential sellers and purchasers of portfolio companies. Such information could be used to directly harm Oak Hill and its partners, including Common Pension Fund E. By way of example, when the General Partner desires to realize an investment (i.e., sell a portfolio company of Oak Hill), it negotiates the purchase price and terms with potential buyers. The value of each partner's interest in Oak Hill is directly linked to obtaining the highest purchase price. However, if the Investment Agreements were disclosed to the public, such potential buyers would have information that would undermine the General Partner's bargaining position. For were know that Oak Hill was of its term and only had a time to liquidate its knowledge would impact the negotiation the price potential buyers the portfolio company.
In his certification, Rubin also describes how the agreements include trade, investing and other commercial and financial matters:
(1) The Investment Agreements . . . include[ ] (i) information on Oak Hill's structure and investment strategy, (ii) information relating to Oak Hill's investment requirements and limitations, (iii) the procedures and formulas for calculating distributions, (iv) the detailed mechanism for allocating profits and losses between the General Partner and the limited partners, (v) the payment of fees and expenses, and other key terms negotiated by Oak Hill, (vi) "key person" provisions and (vii) the identity of the investors who have become limited partners of Oak Hill and the amount of their respective commitments.
Once again, these statements demonstrate that the partnership and side letter agreements with Oak Hill Capital Partners are the proprietary commercial or financial information of Oak Hill Capital Partners.
With regard to the partnership and side letter agreements between the State and defendant intervenor Quadrangle Group, Peter Ezersky, managing principal of Quadrangle Group LLC, asserts the proprietary nature of the partnership and letter agreements:
(1) Quadrangle has spent countless hours developing and implementing the terms of our Investment Agreements. . . . This effort has consisted of years of diligent work by Quadrangle and its principals as well as numerous legal and tax advisors and consultants.
(2) Quadrangle derives independent economic value, both actual and potential, from the fact that the confidential terms of [the] Investment Agreements are not *1121 known to the public, including competing private equity funds that could obtain economic value from the disclosure of such information.
(3) Quadrangle consistently and rigorously polices the confidentiality of the terms governing the investment partnerships we sponsor, including the Fund.
(4) The Investment Agreements are not publicly available, and are delivered in confidence to Common Pension Fund E as a limited partner.
(5) The information contained in the Investment Agreements is provided to Quadrangle employees and agents only on a "need to know" basis and to those persons whose function within the organization requires the knowledge of that specific information in the course of their business.
(6) The Investment Agreements contain express confidentiality provisions obligating each limited partner to maintain the confidentiality of the terms of the Agreements and non-public information regarding the general partner and the partnership, "except as otherwise required by law."
(7) While the partnerships' Certificates of Limited Partnership are publicly filed with the Secretary of State in Delaware, the investment agreements themselves are not publicly filed.
(8) In circumstances where certain counter-parties of the funds have a legitimate business purpose to review the Investment Agreements (e.g. creditors), in each such instance the counter-party is first required to agree to keep the Investment Agreements confidential.
Furthermore, in his certification, Ezersky establishes the manner in which the agreements describe trade, investing and other commercial and financial matters:
(1) The Investment Agreements describe the capital structure of the Fund, the investment parameters and limitations imposed on the general partner's investment decisions, the situations in which consent must be obtained from the limited partners and a variety of other private information about the internal operations and limitations of the Fund.
Viewed together, these assertions from the certifications establish that the partnership and side letter agreements with Quadrangle are the proprietary commercial or financial information of Quadrangle.
Finally, with regard to the partnership and side letter agreements in general, William Clark, Director of the DOI, asserts the proprietary nature of the partnership and letter agreements:
(1) The State has been required to maintain the confidentiality of information regarding the investment funds, including the partnership agreements and the letter agreements, to the extent permitted by law.
(2) Under the terms of the agreements, they may not be furnished to anyone outside of the State's advisors, attorneys and consultants.
(3) Only three employees of the DOI, in addition to the Director and Deputy Director, have access to the executed copies of the private equity fund agreements, which are kept in a locked filing cabinet.
(4) The partnership agreements and letter agreements are not provided to members of the SIC, but instead the SIC is provided with a summary of the material terms of the State's investment in each fund. This [summary] allows the SIC to review the material terms of the State's investment in the funds, without disclosing confidential information, including specific details of the *1122 fund's organizational structure and its investment strategies and parameters.
Clark also identifies how the agreements describe trade, investing and other commercial and financial matters:
(1) The partnership agreements contain detailed information concerning the operations of the general partners and the partnerships themselves.
(2) The partnership agreements typically will contain representations concerning the investment strategies and processes followed by the general partners.
(3) They . . . set forth certain guidelines and limitations on the general partners' investment activities on behalf of the fund.
(4) They set limits on the types of investments that may be made, the amount of capital that may be invested in the aggregate or in a particular transaction, and the length of time during which capital may be invested.
(5) The partnership agreements often include "key person" provisions, designating certain investment management professionals of the general partner as vital to the operation of the Funds and providing contingencies triggered by the departure of one or more of these professionals. The partnership agreements also restrict the outside activities of the general partners.
(6) The partnership agreements limit the liability of the general partners and provide them with indemnification by the partnership for certain actions taken on behalf of the funds.
(7) The partnership agreements grant limited partners the right to remove the general partner, to reduce or extend the term of the partnership or the investment period, and to participate on advisory committees that are able to review certain decisions made by the general partner.
(8) The partnership agreements also provide mechanisms for limited partners to transfer their interests in the funds under certain conditions, to withdraw from the funds, to be excused from certain investments due to regulatory or other issues, or to co-invest with the fund in certain investments.
(9) The partnership agreements set forth a number of accounting and other financial matters, including how assets of the fund are to be valued, how profits and losses are to be allocated, how committed capital is to be called by the fund, how financial information is to be reported to the limited partners and how various tax issues are to be addressed.
(10) The partnership agreements set forth the amount of management fees and how they are to be paid, and set forth in detail how and when the general partners and limited partners are to receive distributions of proceeds received form investments.
(11) The partnership agreements contain default provisions for violations of the terms of the agreements and mechanisms for resolving disputes arising from the agreements.
(12) The letter agreements include provisions with respect to the State's right to a seat on the advisory board of the fund, provisions acknowledging the State's status as a tax-exempt entity, and additional notice or reporting requirements.
(13) The letter agreements deal with certain legal restrictions applicable to the State, including limitations on indemnification and limitations on the contractual liability of the State due to its status as a sovereign entity.
Against this backdrop, the cumulative representations set forth above, coupled with the in camera review, establish that *1123 the partnership and side letter agreements in general are the proprietary commercial or financial information of each of the defendant intervenors. Therefore, defendants have provided to the court substantial information to establish why these documents are (1) owned and considered private and (2) relate to business or the management of investments. From the foregoing, it is also apparent that the agreements meet the three factors identified by the Court in Lamorte Burns & Co., supra, 167 N.J. at 285, 770 A.2d 1158.
The court agrees with defendants that the records in their entirety are proprietary commercial and financial records.

B. TRADE SECRETS
Clearly, defendants have established the documents are exempt as proprietary commercial or financial information. Therefore, resolution of whether the documents are trade secrets is not required. However, for completeness, the court will address whether the government has shown that any information improperly denied as proprietary commercial and financial information was properly denied as trade secrets. N.J.S.A. 47:1A-1.1
Defendants argue the court should apply the trade secrets test set forth in Hammock v. Hoffman-LaRoche, Inc., 142 N.J. 356, 384, 662 A.2d 546 (1995). While Hammock addressed the right of public access to judicial records and materials filed with the court in civil litigation, the Court delineated the test for determining trade secrets. As noted in Hammock, a trade secret consists of "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," Restatement of Torts § 757, comment b (1971), or "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford a potential economic advantage over others." Restatement (Third), Unfair Competition § 39 (Tentative Draft No. 4, 1993); Hammock, supra, 142 N.J. at 383-84, 662 A.2d 546; Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 296, 666 A.2d 1028 (Law Div.1995); Trump's Castle Assoc. v. Tallone, 275 N.J.Super. 159, 162, 645 A.2d 1207 (App.Div.1994). A trade secret can consist of "aspects of business operations such as pricing and marketing techniques." Trump's Castle Assoc., supra, 275 N.J.Super. at 162, 645 A.2d 1207.
In evaluating whether confidential business information is recognized as a trade secret, a court must consider six factors:
(1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
[Restatement of Torts § 757 comment b (1971), quoted in Hammock, supra, at 384, 662 A.2d 546.]
Plaintiffs argue the Hammock test is overly broad and, if applied, would frustrate the legislative policy in OPRA to construe the limitations on disclosure narrowly. Instead, plaintiffs propose the application of the test formulated in Public Citizen Health Research Group v. FDA, 704 F.2d 1280 (D.C.Cir.1983). In that case, the court held for the purposes of *1124 FOIA a trade secret is "a secret, commercially viable plan, formula, process or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." Id. at 1288. Plaintiffs submit this definition of trade secret is more limited that the test in Hammock.
The court agrees with defendants. The court is required to apply the definition of trade secrets in New Jersey that has consistently been used in the past. The phrase "trade secret" is one of art and "[t]echnical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning." N.J.S.A. 1:1-1. When the Legislature uses terms with a technical or special meaning, it is presumed that it intends to use the meaning the courts have applied in the past. See Johnson v. Scaccetti 192 N.J. 256, 276, 927 A.2d 1269 (2007); Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969) ("[There] is [an] assumption that the Legislature is thoroughly conversant with its own legislation and the judicial construction of its statutes."). See also In re Lead Paint Litig., 191 N.J. 405, 430, 924 A.2d 484 (2007)(finding the Legislature used "public nuisance" in its "strict historical sense"); Trinity Church v. Lawson-Bell, 394 N.J.Super. 159, 175, 925 A.2d 720 (App.Div.2007)(finding "substantial completion" in statute of repose used in the sense understood in the construction industry); Zorba Contractors, Inc. v. Housing Autk, City of Newark, 362 N.J.Super. 124, 137-38, 827 A.2d 313 (App.Div.2003)(finding "legal relief used in technical sense to imply right to jury trial).
Therefore, whether the partnership agreements and letter agreements were properly withheld under the trade secrets exemption depends on the extent to which those records fall within the factors enumerated in Hammock.
Concerning the first factor, the extent to which the information is known outside of the owner's business, defendants assert the agreements are not publicly disclosed. To support this, defendants represent: (1) only the general partner, the limited partners, prospective partners and others with a need to know have access to the agreements; (2) parties provided access must sign a confidentiality agreement; (3) the agreements are not filed publicly with the Secretary of State in Delaware or an other government office or agency; and (4) the agreements are not subject to the SEC's disclosure laws. As to the side letters, these are disclosed to no one other than the general partner of the fund and a very limited number of DOI employees. Furthermore, the side letters are only available to the specific investor who is a party to the side letter and to a limited number of other partners who have negotiated access to such documents.
The second factor, the extent to which it is known by employees and others involved in the owner's business, defendants argue the employees, agents and attorneys of each fund's general partner only know the terms of the agreements on a need to know basis and then only subject to a confidentiality agreement. Moreover, as for the State, only three employees, in addition to the Director and the Deputy Director of the DOI, have access to the Partnership Agreements and Side Agreements which are kept in a locked filing cabinet.
With respect to the third factor, the measures taken to safeguard the secrecy of the purported trade secret, defendants note the agreements are not filed with the Attorney General, the State of Delaware *1125 or any other public entity. Furthermore, the funds limit their pool of partners to specific classes of investors so that the funds' agreements are not subject to disclosure under federal securities laws. In addition, all parties to the agreements are required to enter into confidentiality agreements. Finally, DOI maintains these agreements in a locked filing cabinet.
The fourth factor addresses the value of the information to the owner and to his competitors. To support the value of the agreements to their owners and to competitors, defendants argue: (1) each agreement outlines the organizational structures and investment strategies of a particular fund; (2) if released a competitor could use this information to undermine an investment strategy; and (3) if the terms were disclosed, there would be a number of free-riding fund managers that would adopt the once confidential strategy.
The fifth factor relates to the amount of effort or money expended by the owner in developing the information. Defendants assert the parties have expended significant resources to craft the terms and conditions of the agreements. This includes: (1) the expertise required from multiple parties, the general partner, attorneys, tax specialists and other consultants to create the agreements; and (2) the considerable time spent to negotiate the terms and finalize the agreements.
Finally, defendants assert the information contained in the agreements is not easily acquired or duplicated by others inasmuch as the parties to the agreements are required to execute confidentiality agreements to hold the terms and conditions in strict confidence. Moreover, defendants argue, given the amount of time and expertise required to produce these highly complex and specialized documents, the agreements are not the type of document that is easily duplicated.
Plaintiffs argue defendants have not identified, with the required degree of specificity, what parts of the agreements constitute trade secrets. As a result, plaintiffs seek the release of portions of the agreements that do not meet the trade secret exemption.
However, given the paper record, which includes certifications of the Director of the DOI and managers of the private equity funds, coupled with the court's review of the documents, the court is satisfied that the documents meet the six-part test.

C. COMPETITIVE ADVANTAGE
The final issue under OPRA is whether defendants can withhold, under the competitive advantage exemption, any information in the records illegitimately denied under either the proprietary commercial or financial information exemption or trade secrets exemption. OPRA deems confidential "information which, if disclosed, would give an advantage to competitors or bidders." N.J.S.A. 47:1A-1.1. The parties have not raised an issue of statutory interpretation with regard to this exemption, and presumably seek its application according to its plain meaning.
Defendants allege that, based on terms embedded within the agreements, their disclosure would give a threefold advantage to competitors: (1) it would permit other private equity funds to free ride on the effort, monies and experience of the private equity funds in developing the terms of an agreement; (2) it would allow investors competing with the private equity funds to purchase desirable investments to know the extent of the private equity funds' resources and the limits of their investment strategy; and (3) it would reveal the bargain the private equity firms offer to their investors and undermine efforts to attract new investors.
*1126 In response, plaintiffs challenge the explanations, under OPRA, as too vague for a lawful application of the competitive advantage exemption. They compare the present situation to Lykes Bros. Steamship v. Pena, 1993 WL 786964 (D.D.C. Sept. 2, 1993), and Trifid Corp. v. National Imagery and Mapping Agency, 10 F.Supp.2d 1087 (E.D.Mo.1998) where the party arguing for nondisclosure failed to satisfy part two of the National Parks test: that disclosure would "would cause substantial harm to the competitive position of the person from whom the information was obtained." National Parks, supra, 498 F.2d at 770. It was held in those cases that the justifications for non-disclosure were vague and conclusory, and did not show "substantial harm."
The reasons offered for withholding documents must be specific. Indeed, "[c]ourts will `simply no longer accept conclusory and generalized allegations of exemptions but will require a relatively detailed analysis in manageable segments.'" Loigman v. Kimmelman, 102 N.J. 98, 110, 505 A.2d 958 (1986) (quoting Vaughn v. Rosen, 484 F.2d 820, 826 (1973)). However, the court is satisfied that the claims of confidentiality are sufficient, under the competitive advantage exemption, to support nondisclosure.
The partnership agreements and the side letter agreements differ significantly from one another. Each is a unique blend of variables: the amount of debt each fund may carry, what fees the general partner takes from a fund's profits, the limits on the general partner's powers, how a withdrawing partner redeems their investment, how the fund distributes gains, and various other matters. These blends are the product of years of experience, and disclosure of the agreements would give a real, not speculative advantage to competitors who could simply piggyback on the experience of the private equity firms.
Moreover, the agreements detail a fund's limitations on buying and selling investments. Any competitor knowing when a fund's strategy would induce it to buy or sell would enjoy an advantage over the fund. Defendants point to a situation where, by reviewing a fund's partnership agreement, a competitor could learn when a fund would be liquidating an investment. As the time for liquidation neared, a competitor could gain an advantage by offering an artificially low price. Also, defendants explain how disclosure of the agreements would reveal the bargains that each fund strikes with their investors. Competitors who become aware of these bargains through disclosure of the agreements have the information necessary to undercut the bargain that a private equity fund offers to an investor. Pulling away investors from a fund in this manner would advantage a competitor.
Importantly, many of the organizational structures developed by the Funds in order to achieve success in the highly competitive field of private equity investing are embedded in the Partnership Agreements drafted, developed and negotiated by the Funds.

D. IN CAMERA REVIEW AND REDACTION
First, the court has examined the documents in camera to verify and authenticate representations made by counsel in briefs filed with the court and representations in certifications submitted by William Clark, DOI, and senior managers of the private equity funds. Second, having undertaken this laborious review, the court is satisfied when a document falls within one of the statutory exemptions, redaction is not required.
*1127 N.J.S.A. 47:1A-5 addresses redaction in the context of a document that has been identified as a government record and, therefore, subject to disclosure. Section (a) provides that prior to allowing access to any government record the custodian shall redact from that record any information which discloses the social security number and other personal identifying information. Furthermore, Section (g) provides:
if the custodian of a government record asserts that a particular record is exempt from public access pursuant to P.L.1963, c. 73 (C.47:1A-1 et seq.) as amended and supplemented, the custodian shall delete or excise from a copy of the record that portion which the custodian asserts is exempt from public access and shall promptly permit access to the remainder of the record.
[N.J.S.A. 47:1A-5 (g).]
As noted heretofore, OPRA defines a government record as:
any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file . . . or that has been received in the course of his or its official business. . . .
[N.J.S.A. 47:1A-1.1.]
Importantly, the last sentence of the paragraph that defines "government record" provides: "The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material." Ibid. Applied to documents considered government records, the court has an obligation to review documents in camera and, when appropriate, redact inter-agency, or intra-agency advisory consultative or deliberative material. In re the Liquidation of Integrity Ins. Co., 165 N.J. 75, 754 A.2d 1177 (2000). Significantly, this redaction methodology applies to documents already determined to be government records and not to documents considered government records and "deemed to be confidential." N.J.S.A. 47:1A-1.1.

2. COMMON LAW RIGHT OF ACCESS
The common law right of access to public records requires the court to balance the public interest in non-disclosure against the private interest in securing access to the information. Keddie v. Rutgers State Univ., 148 N.J. 36, 51, 689 A.2d 702 (1997); Home News, Inc. v. Dept. of Health, 144 N.J. 446, 454, 677 A.2d 195 (1996). To secure access, three requirements must be met: "1) the records must be common law public documents; 2) the person seeking access must establish an interest in the subject matter of the material; and 3) the citizen's right to access must be balanced against the State's interest in preventing disclosure." No. Jersey Media Group Inc. v. New Jersey Dept. of Personnel, 389 N.J.Super. 527, 538, 913 A.2d 853 (Law Div.2006) (quoting Keddie, supra, 148 N.J. at 50, 689 A.2d 702).
It is undisputed that plaintiffs have standing and that the records are common law records. Clearly, the agreements are filed with the State and have been created pursuant to the State's alternative investment policy. The issue, then, is whether that interest, which confers standing, outweighs the public's interest in keeping the agreements confidential. Where a public agency asserts a claim of confidentiality:
a court must balance the plaintiffs interest in the information against the public interest in confidentiality of the documents, including a consideration of whether the demand for inspection is premised upon a purpose [that] tends to *1128 advance or further a wholesome public interest or a legitimate private interest. Where reasons for maintaining a high degree of confidentiality in the public records are present, even when the citizen asserts a public interest in the information, more than [the] citizen's status and good faith are necessary to call for production of the documents.
Conversely, . . . [a]s the considerations justifying confidentiality become less relevant, a party asserting a need for the materials will have a lesser burden in showing justification. If the reasons for maintaining confidentiality do not apply at all in a given situation or apply only to an insignificant degree, the party seeking disclosure should not be required to demonstrate a compelling need.
[S. New Jersey Newspapers v. Twp. of Mt. Laurel, 141 N.J. 56, 72-74, 660 A.2d 1173 (1995)(quotations and citations omitted).]
The court may consider a non-exhaustive set of factors when balancing interests in confidentiality versus disclosure, which include:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
[Loigman v. Kimmelman, supra, 102 N.J. at 113, 505 A.2d 958.]
Defendants argue there is a significant public interest in maintaining the confidentiality of the agreements. First, if disclosed, the State represents, based on industry practice and experience, the State will lose private equity firms as investing partners. Consequently, the public will lose its opportunity to invest in alternative investments, which have been known to improve the anticipated rate of return relative to market risk. The public interest in the AIP has been reiterated and confirmed by the enactment of L.2007, c. 103 Section 51, which expressly allows the investment of funds by the SIC into externally managed investments.
Second, disclosure of the partnership and side-letter agreements will compromise the public's bargaining power when negotiating future alternative investment agreements with prospective partners. The DOI has a fiduciary duty to seek the best bargain for investors in the pension plan. N.J.S.A. 52:18A-166. If the agreements were disclosed, a prospective partner of the State in the alternative investment program would know the contours of previous bargains and refuse to agree to anything less favorable to it and more favorable to investors. Clearly, that would harm the State's fiduciary interest.
Plaintiffs characterize their interest as a desire to secure a better understanding of how the State is investing employees' pensions under the alternative investment program. Finally, plaintiffs argue: (1) without oversight the union is unable meet its obligation to its members; (2) the public will lose confidence in the pension system; and (3) defendants' claims are too speculative *1129 to be attributed any weight in the common law balancing of interests.
The court concludes the balance of interests weighs in favor of defendants. First, the court rejects the notion that the allegations of harm articulated by defendants are simply too vague and without merit. Defendants' arguments and certifications contain detailed, concrete and plausible explanations of the adverse consequences likely resulting from access to the agreements under the common law.
Second, plaintiffs' position that access to the agreements is necessary to satisfy their interest in understanding investment strategies is undermined by the fact that that interest is largely satisfied by information already accessible by law. N.J.S.A. 52:18A-83(a)(4)-(5) grants one seat on the SIC to plaintiff NJEA and one seat to plaintiff CWA. In turn, N.J.S.A. 52:18A-91 grants the SIC substantial oversight of the investments. According to the certification of William Clark, Director of DOI, the SIC has access to a summary of the material terms of the State's investment in each fund, including the name and type of the fund, the size and geographic focus of the fund, a general description of the fund's investment strategy, the term of the fund and the investment period, the amount of the State's commitment and the management fee paid to the fund. Thus, plaintiffs already have access to material terms of the State's investment in the funds including specific details of the fund's organizational structure and its investment strategies and parameters.
Importantly, the representatives of CWA and NJEA on the SIC will have the same access as the other members. They will not only be able to "understand how the State is managing the pension plan" on behalf of their members, they will be part of that management. Therefore, the issue of transparency has been resolved by statute. Not only does N.J.S.A. § 52:18A-91 provide the unions a direct voice in management of the system's investments, it also: (1) provides what reports the SIC is to make public; (2) requires external investment managers to report in detail on any political contributions; (3) requires an annual public hearing at which time members of the public may comment on the SIC's investment activities. N.J.S.A. 52:18A-91(b) through (d) (2007). That is the compromise that allows the AIP to go forward unimpeded while giving representatives of the State's employees a direct voice in the oversight of the program.
Moreover, the AIP program safeguards against conflicts of interest to enhance transparency and bolster public confidence. First, N.J.S.A. 52:18A-83(b) provides that: "[n]o member of the State Investment Council shall hold any office, position or employment in any political party nor shall any such member benefit directly or indirectly from any transaction made by the Director of the Division of Investment provided for herein." Second, N.J.S.A. 52:18A-91(d) provides that: "[a]n external manager shall be required to file a certification before being retained, and annually thereafter, that discloses the political contributions made, during the 12 months preceding the certification, by the manager or the manager's firm, or a political committee in which the manager or firm was active." These two provisions help ensure that investments benefit the interests of investors and not the interests of the pension fund's managers.
Plaintiffs' position that access to the agreements is necessary to protect the interest of their union members and employees is further undermined by other statutorily guaranteed safeguards. First, N.J.S.A. 52:18A-91(b) requires the SIC to report at least once a year "to the Governor, the Legislature, and the State Treasurer *1130 with respect to its work and the work of the Division of Investment." Second, subsection (c) of the same section provides that:
The council shall hold a meeting each year that shall be open to the public, and shall accept comments from the public at such meeting. The matters that shall be open to discussion and public comment during this annual meeting shall include the investment policies and strategies of the council, the investment activities of the council, the financial disclosure statements filed by council members, and the certification of contributions filed by external managers, as well as other appropriate matters concerning the operations, activities and reports of the council.
These provisions further enhance the public's confidence in, and the transparency of, the alternative investment program. Altogether, the above provisions represent the balance the legislature has established between plaintiffs' interest in oversight of the program and defendants' interest in keeping certain sensitive information confidential. The court hesitates to upset this balance through judicial fiat.
Moreover, plaintiffs, as members of the SIC, already are privy to information they claim to need to better understand the State's alternative investments. As Director Clark has certified:
The partnership agreements and letter agreements are not in the ordinary course provided to members of the [SIC] at its meetings, but instead members of the Council are provided with copies of the report of the Investment Policy committee. Pursuant to N.J.S.A. 52:18A-91, however, the [SIC] is entitled to review all files and records of the division, including the agreements at issue in this case. It is the policy of the [DOI] to permit any member of the Council to review any record of the Division (including the Partnership Agreements and Side Letters) provided that he or she has signed an acknowledgement agreeing to keep such record confidential.
Clearly, plaintiffs' substantial access to the files of the DOI, including the partnership agreements, satisfies their interest to gain information regarding the AIP.
Past experience in other states demonstrates that judicial interference with this balance can seriously compromise an alternative investment program. The State of California holds one of the largest public pension funds in the United States with reported assets for 2005 exceeding $450 billion. Desiring to increase the rate of return on those assets, California's Legislature authorized a program similar to New Jersey's AIP. After implementing the program, the State received and denied requests from the Coalition of the University Employees and the California First Amendment Coalition for disclosure of the partnership agreements that created California's alternative investments. The two parties filed separate complaints based on California's freedom of information law. The plaintiffs won their case. And the court ordered the disclosure of the agreements. See The Regents of the University of California Alternative Investments as of September 30, 2007, http://www.ucop. edu/treasurer/invinfo/pe_irr_907.pdf (last visited Dec. 14, 2010) ("on July 24, 2003, the Alameda County Superior Court ruled in the Coalition of University Employees, et at. v. The Regents of the University of California . . . order[ing] The Regents to disclose fund-level internal rates of return under the California Public Records Act. . . [including] fund-level performance information for the most recent period available."); see also Ann Grimes, CalPERS is Sued to Disclose Fees it Pays to Firms, *1131 Wall St. J., Sept. 8, 2004; Marc Lifsher, CalPERS Discloses Private Equity Fees to Settle a Watchdog Suit, the Fund Agrees to Reveal What it Pays to have its Money Managed, Los Angeles Times, December 8, 2004.
Subsequently, the most desirable, high-performing alternative investment funds refused to take on the State as a limited partner. Despite the benefit of taking on a partner with over $450 billion of assets, the funds' directors preferred to maintain the confidentiality of their investment agreements. To remedy the consequences of the court's decision in favor of disclosure, California's Legislature amended the CPRA to lure back the high-performing funds as partners. The amendments strike a delicate balance between a requesting party's interest in disclosure and the public's interest in keeping aspects of an alternative investment confidential. Under the changes, the name, address and vintage year of each alternative investment fund; how many public dollars are committed to an alternative investment fund over its lifespan; the total public dollars committed to all alternative investment funds; the yearly amount of cash distributions that the public pension fund receives from any alternative investment fund; the year-to-year amount of assets that the public fund has committed in a given alternative investment fund; certain measures of a fund's performance; the amount that the public fund pays in fees to the managers of the alternate investment fund; and the amount of profit the public fund receives from its investment, are disclosed. See California Public Records Act ("CPRA"), 2005 Cal. ALS 258; see also Cal. Gov.Code § 6254.26 (as amended in 2005 (SB 439)) (effective January 1, 2006).
Due diligence material; financial statements of the alternative investment fund; materials from meetings regarding the alternative investment fund; portfolio positions in which the alternative funds invest; capital call and distribution notices; and significantly, alternative investment agreements and all related documents, remain confidential. 2005 Cal. ALS 258 § 2.
California's experience supports defendants' position that court-ordered disclosure of the agreements would likely compromise the State's ability to take advantage of these lucrative investment vehicles. Moreover, experience in other states further bolsters defendants' position. For example, in Texas and Michigan, the Legislatures amended the statutes regarding pension funds for the respective State Universities to classify as confidential, information regarding the funds' portfolio and performance, which had previously been ordered disclosed to the public. See e.g., 2005 Mi. ALS 225 § 5 (as amended in 2005 (2005 Mi. HB 5047)). New Jersey need not repeat these mistakes through court-ordered disclosures of the requested records.
In conclusion, a balancing of the competing interests shows the public interest in confidentiality weighing more heavily, especially in light of other states' experiences with court-ordered disclosure, and plaintiffs do not have a common law right of access to the partnership or side letter agreements.
An in camera review by this court of all of the agreements establishes that the terms of the agreements are complex, and the practice in the industry is to maintain these as confidential and to not accept investments from entities that will not agree to do so or cannot honor such agreements. Moreover, each agreement contains investment strategies, investment parameters for fee structures and partners' rights that may differ markedly from Fund to Fund.
*1132 Significantly, the Legislature has recognized that the interest of plaintiffs and their interests are met without public disclosure of the agreements.

3. CONCLUSION
For the reasons set forth in this opinion, the complaint is dismissed as it relates to the nine documents. None of the parties addressed the imposition of a special fee in the briefs filed with the court or during oral argument. Therefore, this court lacks sufficient information to decide this issue.
Accordingly, the court will leave the record open for two weeks to provide the parties the opportunity to address the special fee issue. Absent any further filings with the court, the case will be dismissed in its entirety.
NOTES
[1] The SIC is charged by statute with oversight responsibility over the investments pursued by the DOI.
[2] The original request contained twenty-one (21) separately numbered paragraphs requesting more than "all contracts or proposed contracts" issued by the State. However, because this 6 opinion deals with the alleged confidentiality of only nine of the identified documents, the other requests have been omitted.
[3] The State later estimated the special service fee to range between $7,129.58 and $11,772.58.
[4] Because the terms and conditions of the Side Letter for Blackstone Capital Partners V.L.P. apply to BCP V-S L.P., there are only four Letter Agreements for the five Funds.
[5] Defendants and defendant intervenors shall be referred to collectively as defendants unless otherwise specified.